POPE v. UNITED STATES (two cases).

Nos. 4721, 4722.

Circuit Court of Appeals, Seventh Circuit.

July 14, 1932.

William F. Waugh and J. J. Goshkin, both of Chicago, Ill., for appellant Frankie Pope.

Harry Olson, of Chicago, Ill., for appellant Fred Pope.

George E. Q. Johnson, U. S. Atty., and Walter E. Wiles, Asst. U. S. Atty., both of Chicago, Ill.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellants were convicted and sentenced upon an indictment of five counts, charging them with transgression of the National Prohibition Act (27 USCA) in the unlawful (1) possession and (2) manufacture of liquor, (3) possession of property designed for manufacture, (4) maintenance of a common nuisance by carrying on a distillery, and (5) conspiring together, and with other named defendants, and with others unknown, to commit each of the offenses charged in the other counts. Jury was waived and the trial was by the court. Both appellants were found guilty, and sentenced—on count 5, Fred to one year and a day imprisonment in a penitentiary and $1,000 fine, and Frankie to eighteen months' imprisonment in a penitentiary and $5,000 fine; and on some of the other counts to pay a nominal fine, and each of them, on one of the counts, to a shorter

term of imprisonment in a county jail—but these sentences to run concurrently with appellants' respective sentences on count 5.

The questions involved grow out of the contention that the record does not disclose evidence sufficient to show appellants' guilt.

It is uncontradicted that during the day of January 12, 1929, federal prohibition agents seized a large still in operation in a house located in a sparsely settled district in Melrose Park, near Chicago, taking 450 gallons of alcohol and 63,000 gallons of mash, with apparatus used in the manufacture of alcohol, and arrested three men in apparent possession of the plant and operating it. One of the men expressed a desire to telephone for help, and, accompanied by an agent, went to a nearby house where he made a phone call. An hour or so afterward Fred Pope appeared at the still, and after some conversation between them Fred and the agents started for downtown in Chicago, about fifteen miles distant. They stopped at Frankie Pope's place on Halsted street, where there was further conversation with Fred and also with Frankie. There was further conversation with Frankie at a restaurant across the street from his place.

It is upon these conversations and the acts of the Popes on that day that the government relies to criminally implicate them.

There is no evidence to show that they actually manufactured liquor or maintained or operated the plant in which it was manufactured, or possessed the intoxicating liquor there found, or possessed the appliances there found which were plainly designed for and intended to be used in such manufacture. The record affords no evidence of any physical connection or act of the Popes respecting this plant or its products.

While it is extremely doubtful whether the conversations afford any evidence which would sustain a conviction on any one of the first four counts, they do disclose a basis for concluding that appellants, with others, as part of a general scheme for carrying on the unlawful business, had some prearranged plan or purpose for protecting this illicit still and its owners and operators from official interference.

As might have been expected, there is contrariety in the different versions of the conversations and of the happenings of that day. If, however, there appears substantial evidence of the unlawful participation and guilt of appellants, their denials and explanations alone would not serve to exculpate them, since in such case we are bound by the conclusion of the trier of facts in passing upon contradictory evidence.

There is evidence to show that Fred's appearance at the still was the result of the telephone message from the nearby house. He was brought there in the car of a woman to whose home the phone message had been sent, and he was accompanied by her son. It was testified that Fred stated to the agents that he represented the owner of the still, who would pay $2,000 to fix things up and let the still run; that there was a "nut" (mortgage or claim) on the place for $4,000 which would be lifted if the still could be operated a week longer. He raised the offer to $3,000, and said the owner might make it $4,000. The agent told him it was not enough for such a big still, and Fred said if the place could run another week, so it would be clear, then they could talk really big dough. He then said he would take the agents downtown to see the boss. Being pressed for the name of the owner, he said, "Tony from Taylor Street," who had an office in a cigar store at or near the corner of Dearborn and Randolph streets. In company with the agents he started, driving the same car in which he had come to the still, ostensibly for the place of "Tony from Taylor Street." Coming east on Washington boulevard, Fred turned the car south a short distance on reaching Halsted street, stopping in front of 14 South Halsted street, where Frankie was running a handbook on horse races. The agents testified that no reason was given by Fred for turning there, but he testified he wanted to phone "Tony from Taylor Street" or "Black Tony." Fred went into the store and told the agents to come on in, which they did, and he went behind a partition there and telephoned "Tony from Taylor Street" asking him to come over. It was testified that he actually talked with some one, saying that the agents had seized the still, and asking him to come at once to Frankie's place.

Frankie was in the store and took up the conversation with the agents. He told them that his cousin Fred was a boob and they should not try to frame him. Frankie recognized one or more of the agents, and it was suggested that they go across the street to talk things over. Fred did not go with them. Frankie said, "I will give you $10,000 to fix that thing up for us out there"; and that he would go with just one of the agents, but if they went back on him he would "h'ist" them; that if there was no "frame," and the agents would act according to his plans, there was

ten grand in it for them. Frankie said to them, "You know I am doing this for a friend of mine with plans out there." Being asked who it was, he said, "It is Tony from Taylor Street," and on being further pressed for his identity said, "Well, you don't want me to tell you that."

Fred denied making any offer of payment, saying it was the agents who asked for money and not he who offered it. Frankie admitted that he said something about "h'isting," which in Halsted street parlance meant "to stick them up with a gun and rob them," and that he did talk to the agents about ten grand, but that he was only "kidding them along" when he said such things.

While the incriminating evidence tends perhaps more directly to prove an attempt to bribe a federal officer—an offense not charged—it manifests more than just a bare attempt at bribery. It tends to indicate familiarity with a scheme to carry on this and perhaps other stills, and tends to indicate a preconcerted plan whereby, as their part of the scheme, the Popes would hold themselves in readiness to come to the rescue in case of interference by the government with the carrying on of this illicit business.

The evidence seems to justify the assumption that the men at the still knew just whom to call in case of trouble, and that in this instance the call brought to the still the intended person, who at once entered into negotiations for adjustment of the difficulty; and that when Fred failed to effect a settlement with the agents, the probably more experienced and effective Frankie, in pursuance of the same general plan, succeeded Fred in the negotiations, and became implicated here not because of the attempted bribe, but because what he said and did tends to show that he had a definite place and part in the conspiracy. And so also as to Fred.

In this state of the record we do not feel at liberty to disturb the court's conclusion upon the facts.

If it may be said that the evidence does not sustain the first four counts, there would be no useful purpose served in directing reversal as to them. Indeed, such a course would be a distinct disadvantage to appellants in that they would be subject to be again tried thereon. The six months' jail sentence as to each upon one count running concurrently with the sentence on the fifth count, and the other counts carrying only nominal fines, the practical effect of an affirmance is to subject appellants to the penalties imposed under the fifth count only.

Finding no reversible error in the judgment and sentence under the fifth count, the judgment of the District Court is affirmed.